UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BRANDAID MARKETING CORPORATION., : 03 Civ. 5088 (WHP)
:
       Plaintiff, : OPINION AND ORDER
:
  -against- :
:
STEVEN S. BISS and :
CYBERIAN ENTERPRISES, LTD., :
:
       Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
STEVEN S. BISS and :
CYBERIAN ENTERPRISES, LTD., :
:
       Third-Party Plaintiffs, :
:
  -against- :
:
PETER MARKUS and PAUL SLOAN, :
:
       Third-Party Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        This action arises out of an alleged sale of the stock of the plaintiff BrandAid Marketing Corporation ("BrandAid") to defendant Cyberian Enterprises, Ltd. ("Cyberian"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. This Court makes the following findings of fact and conclusions of law. As the finder of fact, this Court limits its discussion to the testimony and exhibits that it credits. That task is particularly daunting here because each party deceived the other in their dealings, and that modus operandi also permeated the trial.

FINDINGS OF FACT

I. The Parties

At the time this action commenced, BrandAid was a publicly-traded corporation, organized under the laws of Delaware and licensed to transact business in New York. BrandAid's principal office was in Manhattan (Joint Pre-Trial Order, dated Aug. 10, 2004 ("JPTO") ¶ 7.1; Amended Complaint, dated Oct. 14, 2003 ("Am. Compl.") ¶ 1), and its business was in-store advertising using "supercards in displays mounted in supermarkets" (JPTO ¶ 7.6).

Cyberian is a Hong Kong Company that transacts business in the United States. (JPTO ¶ 7.3.) Defendant Steven S. Biss is a Virginia attorney, who represented Cyberian in its dealings with BrandAid. (JPTO ¶ 7.2; Answer to Amended Complaint by Steven Biss and Cyberian, dated Oct. 22, 2003 ("Ans.") ¶ 10.)

Peter Markus, a Canadian citizen and resident of Connecticut, worked for Corporate Services Group, LLC ("CSG"), a Connecticut corporation that prepares filings for public companies and provides business-consulting services. (Direct Testimony of Peter Markus, dated July 20, 2004 ("Markus Direct") ¶¶ 1-3.) CSG negotiated contracts for BrandAid. (Markus Direct ¶ 15.) Markus also worked in some capacity at the Law Offices of Charles C. Khym in Flushing, New York. (Markus Direct ¶ 3.) At all relevant times, Markus acted as BrandAid's business consultant—not its attorney. (Plaintiff's Exhibit ("PX") III-12,[1] III-14 at 000184 ("Mr. Markus is not the companies' [sic] counsel.").)

---

[1] Plaintiff submitted exhibits in six separate binders, with each binder having identical exhibit numbers. Thus, to facilitate discussion, this Court refers to each exhibit by including the binder number before the exhibit number. Thus, for example, Exhibit No. 2 from the second binder is denoted as PX II-2. Also, because the majority of exhibits are not bates stamped, this Court provides the exact page numbers of the relevant portions of the exhibits only where it is readily available.

BrandAid's Chairman, Chief Operating Officer and Secretary was Paul Sloan. (Direct Testimony of Paul A. Sloan, dated July 20, 2004 ("Sloan Direct") ¶ 4.)

II. Chronology of the Parties' Dealings

   A. The Parties' Initial Contact

On September 30, 2002, BrandAid authorized the issuance of 80,000,000 common shares with a par value of $0.001, and actually issued 7,142,190 shares to the public. (PX V-2 at 4.) In November 2002, Cyberian, through its authorized agent, Steven Massey, contacted BrandAid to express interest in investing in the company. (JPTO ¶ 7.8; Sloan Direct ¶¶ 94-97.) Cyberian sought to purchase 23,500,000 BrandAid shares for $21 million. (PX II-4.)

At that time, Cyberian assured BrandAid that it had cash available for its investment: "[t]he source of cash is from investments and is currently placed in New York at one of the largest USA Banks." (PX II-4; Defendants' Exhibit ("DX") 8.) However, this assurance was false because Cyberian "didn't have the cash in New York." (Trial Transcript ("Tr.") at 292; see also Tr. at 20-21, 190-91, 316; PX IV-5; Direct Testimony of Steven Massey ("Massey Direct")[2] at 5-6.) Indeed, under questioning by this Court, Biss offered contradictory and "Alice in Wonderland" testimony to explain away Cyberian's assurance that it had the necessary funds:

> The Court: . . . [B]ack in November of 2002, you passed on representations to BrandAid that Cyberian had $21 million essentially on deposit at a US financial institution, right?

---

[2] Defendants submitted the direct testimony of their witnesses as one comprehensive document, entitled Direct Testimony of Defendants' Witness, dated July 22, 2004. When citing to the direct testimony of these witnesses, this Court refers to the pagination in that document. Further, because Massey did not avail himself to cross-examination, his direct testimony is only admissible as an admission against interest.

3

> The Witness: The letter I sent to them was Cyberian's letter. Cyberian said they had investments placed with a bank in New York.
>
> * * *
>
> The Court: . . . [The letter] says the source of cash is from investments and is currently placed in New York at one of the largest USA banks. So the source is cash, and it is in New York at a large US financial institution. . . .
>
> The Witness: Judge, I never interpreted that letter to say there was cash in a bank. I interpreted it to say that there was cash from investments that were placed in a bank.
>
> * * *
>
> The Court: Given all the things that happened in this case in these negotiations, and all the e-mail traffic and all of the consternation, did you ever speak to your clients about this $21 million?
>
> The Witness: Yes, and it was disclosed to Mr. Sloan and Mr. Markus that there was no cash in any bank. I never made any representation to them that there was 21 million anywhere, ever. I just never said that to them, and neither did Mr. Massey. It was disclosed to them all along. They knew from the beginning of this until they signed the addendum that there was not 21 million.
>
> The Court: But if there was no 21 million in cash, why would you forward a letter sent to you to them saying that it's currently placed in New York at one of the largest USA banks?
>
> The Witness: They asked for a request for information asking Cyberian for the source of its funds. I forwarded that request to Cyberian and forwarded Cyberian's response to Mr. Markus.

(Tr. at 280-82.) Thus, this Court finds that when Biss forwarded Cyberian's letter to BrandAid, he was facilitating Cyberian's deception, or consciously avoiding the truth.

As part of the contract negotiations, Cyberian also assured BrandAid's representatives that it did not intend to make any changes to the BrandAid board or interfere with its day-to-day operations:

4

> In regards to the current officers and directors of Brandaid there are no changes planned. We have faith in the current management and believe that an infusion have [sic] capital will assist them in becoming very successful in a shorter time period.
>
> The future of Brandaid is in the hands of its current management. We believe that with their industry knowledge, past experience and sufficient capital they will be successful. . . .
>
> Brandaid's place of business is the decision of current management.
>
> Please understand that we in no way, shape or form want to be involved or interfere with the operations of Brandaid. We believe there is long term value with Brandaid and our intent is to hold the shares to be purchased long term.

(PX II-4 (internal paragraph numbering omitted); see also Tr. at 140-41.) As discussed below, those representations proved false.

### B. The Ratification of the Subscription Agreement

On November 14, 2002, BrandAid and Cyberian ratified a Subscription Agreement (the "Subscription Agreement"), whereby Cyberian agreed to purchase 23,500,000 shares of BrandAid for $21 million. (DX 10 at SM02010058; see also JPTO ¶ 7.9.) A revised version of the Subscription Agreement noted:

> The closing of the sale of the Shares shall take place within thirty (30) days of the date of acceptance of this Subscription Agreement by the Company. At closing, the Subscriber or assigns shall tender to the Company and/or the [CSG], Peter Markus, Esquire, by bank draft or wire transfer, the total amount of $21,000,000.00 (the "Purchase Amount"). Upon receipt of the Purchase Amount, the Company shall deliver to the Subscriber or assigns original stock certificates evidencing ownership of 23,500,000 Shares of the Company.

(DX 10 at SM02010065; see Sloan Direct ¶ 148.) In the Subscription Agreement, BrandAid "represent[ed] and warrant[ed]" the following:

5

> (1) The Company is a Delaware corporation, duly organized, licensed and in good standing under the laws of the State of Delaware.
>
> (2) The Company is . . . in good standing [with the Securities and Exchange Commission (SEC)]. . . . The Company and its officers and directors are not defendants or respondent in any action or proceedings which could result in a judgment, award or decision which could materially affect the value of the Company and/or the Shares. The Company and its officers and directors are not the subject of any action or proceeding by . . . the SEC.
>
> * * *
>
> (4) The Company and the persons executing on behalf of the Company have all requisite power and authority to enter into this Subscription Agreement and to perform all of the obligations required to be performed by the Subscription as a seller of the Shares.
>
> (5) All information supplied by the Company to the Subscriber and contained in the Company's public records and listing is true and correct as of the date hereof, and the Company acknowledges that the Subscriber has relied upon the accuracy of such information in deciding to enter into this Subscription Agreement and purchase the Shares. As of the date hereof, the Company knows of no fact or event that would materially affect the value of the Company and/or the Shares.

(DX 10 at SM02010056-57.)

BrandAid's representations were false. BrandAid was not in good standing with the State of Delaware, because its corporate charter had been voided for non-payment of corporate franchise taxes. (DXs 11-13.) Further, BrandAid had materially breached its obligations to vendors, including Safeway, Pathmark, Vectra as well as its previous attorneys, Kleinberg, Kaplan, Wolff & Cohen, P.C. (Tr. at 45; see DXs 26, 30, 33.) None of those adverse events were disclosed to Cyberian. (Tr. at 31; see Tr. at 25-27.) After the subscription agreement was signed, BrandAid's contract breaches with its vendors not only materially

affected the value of the Company but forced it to close down. (JPTO ¶ 7.38; see Tr. at 25; DXs 18-28, 36-37.)

Additionally, BrandAid failed to disclose certain third-party transactions to Cyberian that culminated in lawsuits. (Tr. at 52; JPTO ¶ 7.13; DX 32; see also DX 31.) Finally, BrandAid failed to disclose that the SEC initiated an inquiry into Sloan's activities. (Tr. at 47; DX 29.) Thus, this Court finds that BrandAid attempted to secure the $21 million investment from Cyberian by withholding information about its precarious existence.

On December 9, 2002, BrandAid forwarded a certificate for 23,500,000 shares of its common stock to Biss, to hold in escrow until noon on December 16, 2002, when Cyberian was to pay $21 million to BrandAid. (PX II-8 at 2; JPTO ¶ 7.15.) The BrandAid shares were to be released to Cyberian only after Biss received $21 million in cleared funds. (PX II-8 at 2.) "In the event that the said funds [were] not received . . . , the share certificate [was to be] returned via overnight priority delivery to BrandAid Marketing Corporation." (PX II-8 at 2.) Although Biss never received the $21 million from Cyberian, he did not return the share certificate to BrandAid.

C. The Parties' Failure to Complete the Deal

On December 13, 2002, Biss informed BrandAid that Cyberian needed a 30-day extension to arrange for funding. (JPTO ¶ 7.16.a; Tr. at 145.) The parties agreed to the extension. (Sloan Direct ¶ 154.) On December 20, 2002, Biss relayed to Markus that Cyberian was "in the batter's box" and "hoped" to close before December 25, 2002. (PX II-13 at 000058.) On December 27, 2002, Biss informed Markus: "I have emails in to Steve Massey, and hope to advise of the closing date early next week." (PX II-14 at 000059.) On January 2, 2003, Biss

7

wrote to Markus that Cyberian was "moving towards the closing" (PX II-15 at 000058) and expected to close the deal on January 30, 2003 (Tr. at 278). While the parties continued to discuss the mechanics for closing the deal (PXs II-18, II-19, II-20, II-21, II-22, II-23, II-24, II-25; see JPTO ¶ 7.16.b), Sloan grew inpatient with Cyberian's continued failure to make the promised investment (PX III-1). Because Cyberian was unable to close on January 30, 2003 (Tr. at 278), BrandAid obtained $225,000 in bridge financing from Mel Stewart and Howard Borenstein (Tr. at 189, 276; JPTO ¶ 7.17.b; see Sloan Direct ¶¶ 243-44; PX III-1).

Anxious about Cyberian's inability to close the deal, Sloan informed Biss, on February 7, 2003, that he could "no longer depend on [Biss'] clients [sic] statements directly or indirectly and will seek other sources of funding." (PX III-4 at 000154; see PX III-2 at 000141; PX III-4 at 000159 ("The current crisis that BrandAid faces is directly related to your client's failure to honor his [sic] contractual commitment."); DX 37.) In response, Biss reported that Massey was in possession of "signed written contracts" that would help BrandAid with its finances. (PX III-4 at 000152; see also PXs III-2 at 000133 ("I just received notification that the money has been wired to my account."), II-20 at 000078.) At trial, Cyberian never offered any "signed written contracts." This Court finds that Cyberian's repeated assurances were deceptive.

The following day, on February 8, 2003, Biss forwarded an amended subscription agreement to BrandAid. (JPTO ¶ 7.18; see also PX III-5; DX 37.) BrandAid signed the Amended Subscription Agreement on March 24, 2003. (PX III-8; JPTO ¶ 7.19; Sloan Direct ¶ 307.) The Amended Subscription Agreement substituted a thirty-six month installment payment regime in place of one lump sum payment. (PX III-8; Sloan Direct ¶ 308.) It also extended the closing date to May 23, 2003. (PX III-8; Sloan Direct ¶ 308.)

Just two weeks later, still lacking the necessary funds, Cyberian contacted BrandAid with a yet another proposal. (PX III-12; Tr. at 315-16.) In particular, on April 1, 2003, Massey contacted Sloan to discuss restructuring the parties' transaction. (JPTO ¶ 7.20; Sloan Direct ¶ 311.) Sloan referred Massey to Markus for further discussions. (JPTO ¶ 7.20; Sloan Direct ¶ 312.)

Massey and another businessman, Lawrence Artz, met with Markus. (JPTO ¶ 7.21; Sloan Direct ¶ 316; Markus Direct ¶ 41.) Artz was introduced as "the power behind Cyberian," who acted "for a very rich Chinese family." (Markus Direct ¶ 42; see also PXs V-12, V-13.) At that meeting, Massey acknowledged that Cyberian did not have the funds to "close the transaction," and therefore Artz's assistance was necessary. (Markus Direct ¶ 42.) This acknowledgement, which defendants do not contradict, confirms that Cyberian's earlier statements regarding "signed written contracts" (PX III-4 at 000152; see also PXs II-12, II-13, II-15, II-18, II-20 at 000078, II-23, II-25; Sloan Direct ¶ 232) and Biss' statement that he had "received notification that . . . money has been wired to [his] account" (PX III-2 at 000133) were false.

Artz proposed, inter alia, a cashless exchange of Chinese real estate to BrandAid for the BrandAid shares (the "Artz Proposal"). (See JPTO ¶ 7.21; Markus Direct ¶ 42; see also PX III-13.) The Artz Proposal further involved merging BrandAid into another company and listing the shares of the new company on the American Stock Exchange. (See JPTO ¶ 7.21; Markus Direct ¶ 42; see also PX III-13.) Specifically, Artz's proposal for BrandAid included "acquir[ing] an existing public company which has the requisite number of shareholders, and apply[ing] for listing on the American Stock Exchange," and spinning off BrandAid's existing

9

advertising specialty business. (PX V-13.) Sloan rejected the Artz Proposal. (PX III-14; Sloan Direct ¶¶ 318-30.)

On April 16, 2003, Biss notified Sloan that Cyberian intended to vote the escrowed shares in favor of the Artz Proposal even though Cyberian had not paid for those shares:

> I represent Cyberian Enterprises Ltd. in connection with its rights under the Subscription Agreement, Addendum, and 23,500,000 Shares of the common stock of Brandaid Marketing Corporation ("Brandaid" of [sic] the "Company").
>
> This letter shall serve as Cyberian's written consent to the proposal/plan for simultaneous merger and application to the American Stock Exchange (the "Proposal") presented to Brandaid by [Artz]. As Chairman of Brandaid, you are hereby directed by Cyberian to proceed immediately to execute any and all letters of intent or other agreements necessary to effectuate the Proposal.

(PX III-15; see also Tr. at 315-16; Sloan Direct ¶ 334.) Biss demanded that Sloan proceed with the Artz Proposal or call a shareholder meeting so that Cyberian could vote the escrowed shares. (JPTO ¶ 7.22; PX III-15; Sloan Direct ¶ 334.) Biss warned that a failure to call the shareholder meeting "would be a substantial breach of [Sloan's] fiduciary duties to [Cyberian] and the other shareholders of Brandaid" and noted that Cyberian had already filed a lawsuit in the United States District Court for the Eastern District of Virginia. (PXs III-15, III-16; Sloan Direct ¶ 336-37; Massey Direct at 8 ("On or about April 15, 2003, I instructed Mr. Biss to take legal action against Brandaid for a declaration that Cyberian had a right to vote its shares, even though the shares had not yet been paid for.").) On May 5, 2003, Biss followed up with an email to Markus in which he reiterated Cyberian's support for the Artz Proposal. (PX III-17.)

In early May 2003, Biss launched a cashless takeover of BrandAid. He prepared a Letter of Intent for a joint merger and acquisition agreement of BrandAid with Standard

10

Financial Group ("SFG") and certain other third parties. (PX V-16.) The Letter of Intent noted that BrandAid's new directors would include Artz and not Sloan. (JPTO ¶ 7.26; Tr. at 204, 306-07, 323; PX V-16.) The Letter of Intent's central provision stated: "[i]n exchange for 23,500,000 shares of common stock, Cyberian shall tender forthwith <u>certain of its assets</u>, whose value is not less than $21,000,000 USD." (PX V-16 (emphasis added).)

There is no evidence that Cyberian exchanged assets worth $21 million for the BrandAid shares. Although Biss was the architect of the "merger," he disclaimed any responsibility at trial and asserted that he "had no clue" what "assets were going to be tendered" by Cyberian. (Tr. at 318.) As a securities lawyer intricately involved in Cyberian's dealings with BrandAid, Biss' testimony is not credible. (<u>See</u> Tr. at 237-38, 244-46, 324-26.) Indeed, Biss testified: "I approved the contents of the letter of intent. I thought it was a good idea and the shareholders [of Cyberian] told me they thought it was a good idea to sign this so we could consider the proposal and consider what they were doing in the merger." (Tr. at 323-24.)

Purporting to act for a majority of BrandAid shareholders, Biss informed Sloan on May 23rd that the then-existing officers and directors of BrandAid were terminated and a new slate of directors had been appointed in their place. (PX III-20; <u>see also</u> PX III-21; JPTO ¶¶ 7.27-7.28.) Biss repeated that representation to the SEC. (PX III-19 at 000175.) However, his letter to the SEC was silent regarding the reasons for the change in BrandAid's board membership. The new board consisted of William C. Needham, its Chairman, and Benjamin Wang, Peter Pochna, Hill and Artz. (PX III-20; <u>see also</u> PX III-21; JPTO ¶ 7.36.) This board was installed to approve the SFG proposal after BrandAid's original board declined to act. (Tr. at 322-23.)

11

Simultaneously, Cyberian and BrandAid, through its new Chairman Needham, attempted to consummate the land-for-shares swap. (PX III-24; JPTO ¶ 7.29.) That cashless stock purchase agreement was filed with the SEC. (JPTO ¶ 7.29.) The parties did not present any credible evidence to establish that the land exchanged for the shares was worth $21 million.

On June 3, 2003, Sloan, purporting to act for BrandAid, demanded that Biss cease and desist from taking further action. (JPTO ¶ 7.30.) The next day, Markus asked Biss to return the BrandAid shares in escrow. (JPTO ¶ 7.31.) Refusing to return the shares, Biss asserted that his actions complied with Delaware law and SEC rules. (JPTO ¶ 7.32.)

On June 13 and 16, 2003, Biss filed various forms with the SEC. (JPTO ¶¶ 7.36-6.37.) On June 17, Sloan filed a Form 8-K, reporting that BrandAid had lost its funding and was "temporarily ceasing operations" because of Biss' activities. (JPTO ¶ 7.38.)

## CONCLUSIONS OF LAW

BrandAid asserts three claims against Cyberian: (1) breach of contract; (2) violation of Section 10(b) of the 1934 Act and Rule 10b-5, 17 C.F.R. § 240.10b-5; and (3) fraud.[3] In turn, Cyberian asserts counterclaims and third-party claims for (1) fraud against Sloan and BrandAid; (2) tortious interference with contract against Markus; and (3) breach of an implied covenant of good faith and fair dealing against Sloan and BrandAid.

As discussed below, this Court concludes that all of the parties' claims are barred by the doctrine of in pari delicto. See Peltz v. SHB Commodities, Inc., 115 F.3d 1082, 1089-91

---

[3] Plaintiff initially asserted claims for injurious falsehood and tortious interference with shareholders, but has withdrawn those claims. (See Plaintiff's Proposed Findings of Fact and Conclusions of Law, dated Aug. 23, 2004 ("Pl. Mem.") at 20: Proposed Finding of Fact ¶ 46; JPTO ¶ 4.)

(2d Cir. 1997) (holding that the in pari delicto defense bars a plaintiff's claims for violation of the Commodities Exchange Act where the plaintiff participated in the scheme to manipulate the commodities market); Ross v. Bolton, 904 F.2d 819, 824-26 (2d Cir. 1990) (holding that the in pari delicto defense may bar a plaintiff's Rule 10b-5 claims where he knowingly engaged in an illegal trading scheme).

I. The In Pari Delicto Doctrine

The in pari delicto doctrine states that "if the parties are in pari delicto—equal fault—then recovery will be denied." Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution 564 (2d ed. 1993); see also Pinter v. Dahl, 486 U.S. 622, 632 (1988); Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306 (1985) ("The common-law defense at issue in this case derives from the Latin, in pari delicto potior est conditio defendentis: 'In a case of equal or mutual fault the position of the defending party is the better one.'" (quoting Black's Law Dictionary 711 (5th ed. 1979) (internal alternations omitted))); Peltz, 115 F.3d at 1090 ("[W]hen there is mutual wrongdoing, the law favors the defending party."). That is, "the plaintiff should not . . . recover, and the parties should be left where they are." Ross, 904 F.2d at 824. The in pari delicto doctrine "is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." Bateman Eichler, 472 U.S. at 306; see also Ross, 904 F.2d at 824-26 (finding the in pari delicto doctrine applicable where plaintiff knowingly engaged in an illegal trading scheme); Abright v. Shapiro, 214 A.D.2d 496, 496-97, 626 N.Y.S.2d 73, 73-74 (1st Dep't 1995). In the context of this action, Lord Mansfield's observation is particularly apt:

> The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed. . . . The principle of public policy is this; ex dolo malo non oritur actio [out of fraud no action arises]. . . . It is upon that ground the Court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff.

Holman v. Johnson, 98 Eng. Rep. 1120, 1121 (K.B. 1775) (quoted in Bateman Eichler, 472 U.S. at 306 n.12); see also Austin's Adm'x v. Winston's Ex'x, 11 Va. 33, 47 (1806) ("He who comes here for relief must draw his justice from pure fountains"); Fid. Bank, Nat'l Ass'n v. Avrutick, 740 F. Supp. 222, 232 n.9 (S.D.N.Y. 1990); Abright, 626 N.Y.S.2d at 73-74; Ford v. Henry, 155 Misc. 2d 192, 193-94, 598 N.Y.S.2d 660, 661-62 (App. Term. 1993). Under slightly different facts, the New York Court of Appeals explained the principle as follows:

> It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose. For no court should be required to serve as paymaster of the wages of crime, or referee between thieves. Therefore, the law will not extend its aid to either of the parties or listen to their complaints against each other, but will leave them where their own acts have placed them.

Stone v. Freeman, 298 N.Y. 268, 271 (1948).

"[A] private action for damages . . . may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." Bateman Eichler, 472 U.S. at 310-11. The defense applies where the plaintiff participates in "the same sort of wrongdoing" as the defendant, Bateman Eichler, 472 U.S. at 307, and the degrees of fault are essentially indistinguishable, Peltz, 115

F.3d at 1090 (citing Pinter, 486 U.S. at 636). Finally, it is not necessary that the plaintiff and the defendant have participated in the same illegal acts, but that the two parties' wrongdoings stem from the same subject of the litigation. See Pinter, 486 U.S. at 632; Peltz, 115 F.3d at 1090-91; UCAR Int'l Inc. v. Union Carbide Corp., No. 00 Civ. 1338 (GBD), 2004 WL 137073, at *11 (S.D.N.Y. Jan. 26, 2004) ("Even if the wrongdoing is not of an 'identical nature,' it does not destroy the defense."); see also Bateman Eichler, 472 U.S. at 310-11 (noting that the plaintiff must bear substantially equal responsibility "for the violations he seeks to redress").

II. Application of the In Pari Delicto Doctrine

Both plaintiff and defendants seek to hold the other side liable for the transaction's failure and their resulting losses. Thus, both plaintiff's and defendants' actions satisfy the first prong of the Bateman Eichler test in that, as a direct result of their own conduct, they bear at least substantially equal responsibility for the violations each seeks to redress. As noted above, BrandAid, through Sloan, repeatedly made false statements and omitted material facts in its representations to Cyberian in order to obtain an investment of $21 million. For example, while BrandAid's corporate charter was revoked in March 2002 and remained void at least until July 9, 2003 (DXs 11-13; see also DX 14), BrandAid represented that it was in good-standing in Delaware, its state of incorporation. Further, BrandAid withheld information about its involvement in legal proceedings and the SEC's investigation of Sloan's activities. Finally, BrandAid concealed that it was in default of its obligations to almost all of its major vendors. In fact, those defaults led to the company's closure. Thus, BrandAid tried to deceive Cyberian into investing in a company that was practically worthless.

For their part, Biss and Cyberian concocted a scheme to take over BrandAid

15

without any investment. Cyberian promised BrandAid $21 million when it had no such funds. Cyberian repeatedly made false promises of prompt payment. Cyberian also launched a brazen takeover of BrandAid without tendering the promised funds. As part of that scheme, Biss attempted to vote escrowed shares that Cyberian did not own. Finally, Cyberian and Biss attempted to force BrandAid to accept the Artz Proposal without any due diligence into the value of the assets to be exchanged for BrandAid shares.

This Court also finds that application of the in pari delicto doctrine satisfies the second prong of the Bateman Eichler inquiry. That is, preclusion of plaintiff's and defendants' claims would not interfere with the effective enforcement of the securities laws and protection of the investing public. "Au contraire, allowing [the parties' claims] would significantly interfere with the enforcement of statutes designed to protect the investing public." Peltz, 115 F.3d at 1091. To find for plaintiff, this Court would have to ignore BrandAid's repeated misrepresentations and omissions to Cyberian, the potential investor. Such a finding would sanction the very activities prohibited by the federal securities laws. See Peltz, 115 F.3d at 1091; see also Pinter, 486 U.S. at 637-39. Conversely, any ruling in favor of defendants would reward them for their misdeeds. To avoid such mischief, equity and conscience require this Court to declare "A plague o' both your houses!" W. Shakespeare, Romeo and Juliet, Act. III, scene i, line 90.

## CONCLSUION

Accordingly, this Court concludes that the plaintiff BrandAid Marketing Corporation is not entitled to any recovery against defendants, and that defendants Steven S. Biss and Cyberian Enterprises, Ltd. are not entitled to any recovery against plaintiff or the third-party defendants. The foregoing constitutes this Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The Clerk of the Court is directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure and mark this case closed.

Dated: August 31, 2005
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Copies mailed to:*

Paul W. Siegert, Esq.
49 West 33rd Street
New York, New York 10001
*Attorney for Plaintiff*

Robert W. Popescu, Esq.
Fried, Iosepovici & Popescu
225 Broadway, Suite 1901
New York, New York 10007
*Attorney for Defendants*